Good to have you all here. And Elizabeth Campbell. Ms. Campbell, you're the first lawyer on my list. Lucky me. Look forward to hearing from you. May it please the Court. The most important issue before this Court to decide is whether, under South Carolina law, ratification can be used to make an unlawful act lawful. The answer to that question must be no, it cannot. That ratification, as an affirmative defense, should not and cannot be used as a legal excuse to allow or justify an act that has already been determined to be in clear violation of the law or outside the bounds of an organization's authority. The act that we're talking about here is CSA's calling of a referendum to amend the 1974 Covenants and impose a new, separate, annual infrastructure funding assessment on the residential property owners of Sea Pines Plantation in Hilton Head, South Carolina. This matters because the implications of that act and this Court's decision are going to extend to far greater population than simply the parties to this appeal. In fact, this decision will have major ramifications for every HOA and planned community in the state of South Carolina, as well as non-profit organizations in South Carolina. Go back to your initial statement that ratification is not something available under South Carolina law to do something that's unlawful. And by unlawful, I assume you're moving to the part about not being authorized under the law to do so. Yet the trial judge seemed to have made a statement that, well, ratification presupposes a lack of authority, that you don't need a ratification if you don't have something like that. How do you address that? Because I think there is a distinction. I think the difference is whether you have the authority to do a certain act and you haven't done so in the proper manner. If you have that authority to begin with, I think ratification can be used in order to address that procedural defect, if you will. Here, the problem is the act itself of calling the referendum was not lawful. And I think the district court properly found, after reviewing thousands of pages of the record, in declaration... When they put this thing together after the bankruptcy. That's right. Somebody made a mistake when they wrote up the agreements after the bankruptcy. That was my impression from reading the record. That it must have been a mistake. I think it's just a... So unlawful is kind of stretched out of it. I think the issue is... You can do that. I mean, that's what lawyers do a lot. I don't think it's a stretch here. Because I think the difference is the act in calling the referendum to amend the 1974 covenants was actually dealing with the 1974 covenants. And not the covenants that came out of the bankruptcy. The district court certainly looked at those covenants. And those are the 1988 covenants. And the district court also looked at the bylaws of the organization. Which in and of themselves don't allow this particular funding referendum. I thought the court's reasoning was that it takes at least 10% of the participating property owners. They can call for a referendum, right? Correct. And well more than 10% of the participating property owners voted in favor of this referendum. So they ratified the act of CSA as their agent. I think that's part of the court's analysis. I think the court also determined in applying ratification... Do you agree that it's legal, as you're calling it, legal or illegal. It's legal for 10% of the participating property owners to call for this referendum. Yes, I agree with that. And I think that's the only way a referendum to amend the 1974 covenants can be called at the present moment. Why was it illegal for them to then vote in favor of it and ratify what CSA had done? Because the second element of ratification requires full knowledge of the material facts. And that's typically a jury question. Full knowledge of the material facts in this case... Let me take a step back. The concept of ratification requires first that you have the knowledge and then you vote in favor of it. And if what they were voting for... I want to make sure we get to the first point. The knowledge aspect of it. Because I understand it. There are two ways in which you can call for a referendum. And there are two entities that can do it. 10% of the referendum or this result. The result says I won't do it. You've got a third party. CSA or whomever comes in and they call for a referendum. And then 10% goes along with it or more and they say ratification. If that's so, it didn't have to be CSA. It could be somebody on the street decided to call for it. Or if you look at the contract that way, I'm not following that. Is there a differentiation between... You move into the knowledge. Did they know of this fact? Which gets into the elements of ratification. But initially, you're dealing with the illegality of even calling it. You go in and you can't benefit from doing something. And there's evidence all over this record. They knew well they couldn't call this referendum. They tried the proper way except for the 10%. Which I don't understand. Maybe it's because there's so many people they didn't want to go and get it. But something like 10% for something they could get. Why didn't they just go do that? Which is a question I'll ask the other side of it. That's the confusing part of this case. But even where you are now, it seems to me... I mean, this is where we are now. But it would seem to me, why didn't they... Even if you find out you get a suit on this, why don't you go and get 10% and do it again? Is that available or what? It absolutely should have been. And, in fact, that's what the resort asked them to do. Because when it was presented, when the initial objection by one of the other property owners... How many constitute 10%? What number would that be roughly? It has to be known because that's a big factor. The amount that voted or the amount of voting participating property owners was 5,351. So roughly 5,356. You've got to go around and get the signatures. Yes. And that must be some reason they decided they wouldn't go get that signature. That is the most not a part of the case I cannot understand. When I see why we're here, if the resort said go get the 10% and you've got 5,000-some-odd people you can go and get it from... You only need 530. There has to be a reason why they didn't go get that 530. I don't know what it is, but it doesn't make any sense to me. Because if you can get them to vote for it at 87%, you would think 500 or so would... You could find that pretty easily. Well, they gave a reason, Judge. We asked them during the discovery phases. And this is part of our summary judgment motion. And their reason was they didn't want to have to administer it. And it had never been done before. And they were worried about this and worried about that. Sam Bennett, who was... What would it entail? Does it mean taking a petition around to the households and say sign this for a referendum? And all you've got to do... You can go to 5,000 houses and all you need is 500 of them? 530? That's right. And the other interesting fact is if you do the math on who voted, there were 4,446 votes that were returned. And of those, 3,551 voted in favor. That swing is only 517 votes. So while it sounds like a huge margin, it's really not. It's less than 10% of the participating property owners based on the comparison that we just did. That's on the initial phase. And the point that Judge Rusham is going to is, well, if you've got 87%, at least you know 10% of them would have called it. Right. Therefore, it ratifies it. But my question there goes is did it have to be CSA to do it? Could it be I'm riding by the property and I decide I'm going to call for a referendum and 80% of them went along with my referendum and now I'm ratified. But I don't have anything in the world to do with it, even though they do because they controlled the gateway and all the other stuff there. So by design, the 1974 covenants say there can be an amendment for a funding referendum in two ways, one by 10% of the participating property owners and two by the original developing company, which no longer exists. It's very clear that neither of those two methods were used initially. That's why you get the word ratification coming in because had that been used, we wouldn't be here on that. So that's understood. The question is, as you started out, can you do something? Can you get in a legal method and call it ratification when you knew from the beginning you couldn't call it, but you did it anyway? And now the court says you ought to be rewarded because, well, they would have done it anyway. So like a harmless error, sounds like to me. Ends justify the means. I'm sorry. I thought the district court said the parties do not dispute that CSA may be considered the PPO's agent for ratification purposes, and the court is satisfied that it may. So there's no dispute here that all the PPOs are members of the CSA, and the CSA is their agent. So Judge Wynn is not the agent for the PPO members, right? He can't come in and say, I'm acting as their agent. I'm going to call a referendum. Their agent called for a referendum, and now it turns out the agent didn't have authority to do that. The agent probably knew it at the time, but the principle ratified what the agent did. That's what the district court said. And I'm not entirely sure that it's not in dispute. I think part of the issue that we have. Did you appeal that? Did you appeal that CSA is the PPO's agent? We appealed the standard that was used by the district court because it's not our client's burden to prove that, and our client doesn't have to rebut that premise. But that's a fine. We're on appeal now. That's a conclusion in the district court's opinion. And if you disagree with it, you have to appeal it and ask us to reverse it. I think we've appealed the application of ratification. I think as to, there are certain instances. You filed a cross appeal. We filed the initial appeal. You filed the initial appeal. They filed the cross appeal. That's right. If we apply agency law, do we need ratification? In other words, in the agency law, if you're representative of it, under that theory, then you don't need 10% because I represent all of you. Then do you need ratification? If you apply agency law, there's no point in having declarations and covenants in the first place. You're just going to always have the HOA or the HOA. That's the agency aspect that gets into it. That presupposes or concludes a fiduciary relationship, which is a good faith inclusion in it. So, I don't see how in the world you can go and say, I'm an agent for someone and I've been to resort. I can't get them to do it. They told me to do it all these different ways. I know what this says. And then I go and do something for you, but I don't disclose to you all of those things that were done. If we go on agency law, which they use the restatement and all that for their purposes. And that's where it gets confusing because when you deal with ratifications, it includes aspects of that. But here, that ratification comes about as a result from your perspective because it was illegal to do it for. But if you use agency, that takes care of the legal part of it, but it creates this other issue in the fiduciary duty issues that are in the case. And there are fiduciary duties present. I mean, CSA chose to be a nonprofit. There are fiduciary duties that run under the nonprofit statutes. We also disagree with CSA's premise that the nonprofit statute in subsection 18, simply because it said you could do whatever was necessary and appropriate, that it gives you full breadth and unbridled power to do whatever you want. In fact, there's limiting language there because you have to stay within the bounds of the law. And if you look at the covenants and declarations, which are contractual documents, they bind all of the parties and they run with the land. So if you have clear, unambiguous covenants that say this process can only happen in these two ways, you can't use the nonprofit act to get around that. It's not meant as a stopgap. You still have to act within the bounds of those powers. And corporations, including nonprofit corporations, can only exercise the powers that are granted to them by law, by their charters, by their bylaws, by their covenants and declarations. Turning back to... Do you know what that red light means? I do, Your Honor. I apologize. I'm sorry. I will... We've given you a little bit of extra time. Thank you. And let's see. Mr. Widener, good to have you with us. When counsel said that the most important issue in this case was the question of whether or not ratification can ever be used in a case like this, I find that interesting because she raised that argument for the very first time in this case in her reply brief. She never raised it to the district court judge, either in her summary judgment opposition memo or in the district court hearing. And she never raised it to this court in her opening brief. You talk about a district court hearing. Did Judge Norton hear an argument on all this? Yes, he did, Your Honor. Did he take any evidence or anything? He just heard the oral argument. He heard the argument. He let the lawyers come in and let them... Everybody submits their memos with their exhibits and all that sort of standard stuff. But they're arguing that as a matter of law, ratification can never be used here, can never do an unauthorized or unlawful act. That is not the law in South Carolina. They cite a bunch of cases. Not one of those cases, not a single one, involves an issue of ratification. They involve questions like a corporation enters into a contract that was barred by statute specifically, and they tried to argue that they could have ratified it, that the parties to the contract could ratify it. And the court said, no, you can't. And that's where ratification is there, that it somehow could be ratified by them. And in that particular case, the interesting part was that the guy in the middle doing all this stuff was an agent of both parties to the contract. And so they said it stayed in the same circle. It's not ratification. Judge Rushing, you are correctly reading the judge's order. He specifically said, it's uncontested, that CSA is an agent of the PPO. And they did not appeal that. They have not yet, in any of their briefs, said that that was wrong. They also argued about material facts being disputed. The lack of authority, the question was whether or not we disclosed that. It has never been, for the purpose of this summary judgment hearing and this appeal, there is no factual dispute that we did not tell, say, that we lack the authority. The reason we didn't do it is very simple. We believed then and we believe now that we have that authority. Let me ask you, at least in terms of agency and defying the fact by the judge in the beginning, and I was separating at least the – I know you get into the ratification once you get agency, you get into the knowledge and, you know, was it done openly in disclosure. But fundamentally, when you think of how does this occur? If the contract gets set, you need 30% of the people or 50% of the people here to ratify this, to do it. It really comes, if they're the agent, why do they need a referendum? Because they can vote on it. They represent all of the people. And they could call it and then cast the vote as the agent. Can they do that? No. Because it's clear that the vote has to be by a 75% supermajority. But they are the agent of all of them. But you have to have the referendum. No one is disputing that you have to have a referendum. I understand you're not disputing it. I'm just talking about agency law. If you are the agent, you have the authority to act on one's behalf, and you maintain that as the agent, you can fulfill the 10% requirement to call for a referendum, then why as the agent, if you're an agent for everyone, can't you fulfill the additional requirement of voting to say it's down to law? Judge, it is not our argument. No, no, no. It's my argument. It's my question. It's a legal question. It's because it's interesting to me. That's what I'm trying to figure out. But you need to teach me a little agency law so I can understand. If you're an agent and everybody disputes you're an agent for everybody, all 100%, and by being an agent, you don't have to fulfill the contract requirement of going to get 10% or going to the resort. You can do it yourself because you are the agent for all of them. Then when the actual vote comes to all of them, why you got to go to all of them because you are the agent for all of them. Can you do that? We cannot amend the covenants acting as an agent. We cannot impose an assessment acting as an agent. Where is that stated? Does the agent agreement say you can't? In other words, if you give someone, it's not like a power of attorney, I guess, or whatever, but if you take the agency position for someone and you represent them in everything, if you can be the 10%, why can't you be the 75%? That's my question. Because we weren't acting as a 10%. But you needed 10% in order to, the contract don't allow 10% of the members or the resort. You don't have the resort, but you can do it because you're the agent because you can do it for the 10%. So whether you're acting for the 10%, that's the authority that's necessary to do it. So you've got to do it as an agent and represent at least 10%, right? That's what the property owners would have to do. We don't claim that we did it as an agent. How did you call for the referendum? In what capacity did you call for the referendum? In our view, we called for the referendum under the view that the covenants do not prohibit us from doing it and that therefore the Nonprofit Act gave us the power to do it. And that's our cross appeal. Because the trial judge said the covenants say only these two people can do it. So we offer that point. Because I was laboring under that, that only two entities could call for that referendum and apparently your clients understood that apparently for some point in time with the resort, they couldn't get it there to go 10%. They made a board meeting and decided to go this way. But you now say forget the 10% and the resort. Your entity had the authority to call this without agency. You don't need agency, is that right? We went to the resort because we knew that would be the easier way to do it. When they said no, we already had advice from counsel. But they need agency law to be able to call this referendum. We called the referendum under what we believe to be our authority to do so, not through agency but through the operation of a statute. I'm just trying to teach me law here. You said you didn't need agency law to call this referendum, correct? Correct. And that is your position is you just called it under your own authority that comes from where? Not under the 74 agreement. It comes from the South Carolina Nonprofit Act. Oh. That's what I thought your argument was. Yes. Another misstatement of South Carolina law that my opposing counsel made was that a corporation, a nonprofit corporation, can only exercise those powers expressly granted to it. That is exactly what the General Assembly rejected in the South Carolina Nonprofit Act when they amended it to get rid of the Supreme Court's decision in Lovering. What they said was you have all powers granted to you that are necessary or even convenient, which is a departure from South Carolina law, to do those things that help you serve your purpose unless it is expressly prohibited by your article of incorporation and then your bylaws or the covenants. We agree covenants are a governing document. So the question becomes. You do have that language. You just mentioned that word. Under the Corporation Act, South Carolina nonprofit deals with limiting documents. Right. Is that 1974, the document we're talking about? That's the question, yes. I'm asking you, is that a limiting document here in terms of what the authority that's given them? We say that it is not. The trial judge found to the contrary. Trial judge says, so we're back in 1974 with this document. So are we now, with that limitation on it, put that with the South Carolina Act? You're now back with 10% in result, right? No, Your Honor. It's our position that we have an independent, independent of our principles. Where does that come from? It comes from the Act. And it's, give me that language, that says, because the entire read says. Nonprofit. Limited by their governing documents. Correct. Or independently, they can do it irrespective of the documents. I want to see that language. We're not arguing they can do it irrespective of documents. If this court finds that Section 1J. What does it say, if we don't like the documents, we can do it independently? I know I'm making that a little bit more than what it needs to be. But the point I'm asking, you say it's independent. Yes. Where is it that says you have this independent authority with that limited language that's in the statute? That's the question. We don't agree, it's our cross-appeal, that the language in the covenant is not limiting. It does not prohibit us from doing it. It's not a limiting document, it's a limiting provision or something? No, it's a provision that says it can be done this way, but it doesn't say it can only be done this way. Unlike other parts of the covenant, it says these things can only be done that way. And under South Carolina law, the exclusion of one, the exclusion of one and the exclusion of the other, it's a rule of construction that's used by courts across the country. And, you know, give me your result and I can give you a rule of construction. Is that red lightning? Yes, Your Honor. I was asking you this question, but I have to sit down. Mr. Linton, you're next on my list. Thank you, Your Honor. May it please the Court, John Linton on behalf of the Sea Pines Resort, LLC. The district court judge found that the resort is the holder of the company's referendum rights under the covenant by assignment. That has not been appealed or argued on appeal. What does that mean? The resort is the holder of it? It was assigned that right. Isn't there a dispute on that? I thought we all kind of agreed the resort could call this referendum. Well, then I could just sit down, Your Honor. But the resort didn't call one. The resort did not call it. So what? The referendum provision has two rights that are afforded to the company. One is to call the referendum. Then if the referendum passes, the company has to approve the recording of the amendment. Here, the resort did not call the referendum, but it did approve the recording of the amendment. The district court judge found that the resort holds that right through a series of assignments, starting with the bankruptcy court. That was not challenged on appeal. There was some suggestion and argument of opposing counsel that perhaps the resort… They don't challenge that, right? They don't challenge that, other than in their statement here today. What's the point? I'm missing a point. I don't understand why you're arguing. If it's not challenged and they can approve it, then… Exactly, Your Honor. And part of the reason I reserved time to talk was because there was a suggestion in their reply brief that maybe they were going to have some argument to that effect. And there was a slight suggestion that… It was the first time in their reply brief. If you don't bring it up in the initial brief, it's hard to get this going. But a suggestion is a hard thing to get before it's going. Thank you, Your Honor. But I got your point. And we completely agree. And if there are questions, I'll be glad to answer any of them. Are you a cross-appellate, too? No, Your Honor. You're on the cross-appeal. We are only on the appellee side. We are not part of the cross-appeal. That's just… You're not part of the cross-appeal. Correct. But you're supporting the appellee. We are supporting the appellee and that the district court should be affirmed. How many people are in this result? What constitutes the number that you would derive a 10% from? I believe those numbers that counsel gave you were accurate. Five thousand, so five hundred. Five to six hundred. Property owners, I thought. Right. Some of them are families, right? I believe that's titled property owners. That's participating. I've been there. They've got big, nice homes. One of the best golf courses in the world. Thank you, Your Honor. You can't put that in your advertising. You've got a big lighthouse. Lots come in there. My question earlier was, was it that difficult just to go get 500 signatures out of 5,000? Well, Your Honor, I'll have to let CSA address why they didn't do that. As you know, the resort... You don't know. You don't know. I know from discovery that what they said was they were ready to do... We'll pass it because that would be hearsay. Thank you, Your Honor. You finished, Mr. Linton? Yes, Your Honor. Thank you. I've got Mr. Goddard. Yes, Your Honor. Good to have you with us. Thank you. I appreciate it. Mark Goddard here on behalf of the association. Tell us the answer to that question that I asked about the 500. What? Did you go to door and knock on the door and get 500 signatures? Man, we wouldn't even be here. We may not be here if that would have happened. I would agree with that. Was it hard? What was the reason? I mean, politically, you think about people do this all the time. Go out and get referendum. Put people on candidates and stuff. You got 87% plus, almost 90% that voted in favor of this. You have to believe there are 500 people in there that would go along with you. I mean, I would think, but what is it? Your Honor, I'm going to refer to us as ASPO because it's much easier than the Association of Sea Pines Plantation Property Owners. The Association of Sea Pines Plantation Property Owners, Inc. You represent the property owners. Well, it is a volunteer homeowner's association. Homeowner's association. Separate and distinct. You got the people who own those big houses. Well, we are a volunteer. It is a little bit different than your typical HOA. Well, there's a town in there too, isn't there? There is a town of Hilton Head. Yeah, out there at the port. No, I'm talking about right there next to that lighthouse. There are several commercial entities as well. Your Honor, the limited issue that we are here on is whether we breached our covenants in supporting the referendum. And the items we did to support the referendum are limited in nature. And one is we had a resolution on November 30th where we unanimously approved as a board that we were in favor of the referendum. Importantly, at that time, as it was presented, it's undisputed that we believed, or it was being presented to us, we believed the resort was calling it just as all the other referendums had done. So when that was done, we believed that. Later... What does that mean? What does that mean? That means you didn't know the underlying... You were gullible? Well, the way it was presented to us at that meeting was... You're being very careful with those words. I'm trying to understand what you're saying. You said, well, we believed it at that time. What does that mean? That means you didn't know? What was presented to us had language of the same language of previous referendums that the resort was going to call it. And that's what we voted on in November. So you went on the belief that the resort was actually calling that referendum? I think this is important. In November, that is, the November 30th meeting, that is correct. Later, through discovery, it was discussed. Our president learned at a later date, and other board members learned, that CSA was moving under the Nonprofit Act, and the report was the resort was not calling it. And at that time, our president testified... Not calling it wouldn't call it. Correct. Yeah. Our president testified she was familiar through her previous use of the Nonprofit Act and various land management decisions that she did in other...unrelated, that they had additional powers under the Nonprofit Act. What's important through all of that is what the district court said, is all of these actions of ASPO were protected by the business judgment rule. The support of the referendum, or better said, the purpose of the referendum, was to create an infrastructure, monies to repair that later. Our bylaws are clear. Our purpose is to promote the common welfare and well-being of the property owners. Clearly, as the district court said, supporting improving infrastructure was well within our purpose. Because of that, any analysis of what we did would be an intra-virus act and protected by the business judgment rule. Importantly, your honor, there was no evidence in the district court said, there's no evidence presented that that reliance was unreasonable or that our knowledge that the resort was not calling it when we voted on the amendment was unreasonable. Business judgment rule clearly says they have an affirmative... the plaintiff would have had an affirmative duty to show lack of or bad faith or corrupt motives, and none of that was present in this case. Therefore, the district court properly found that our decisions were protected by the business judgment rule and therefore could not move forward on the breach of contract action. My light has come on. If there's any other further questions, happy to answer those. Thank you, your honor. Thank you very much, Mr. Goddard. Now, back to Ms. Tillman. Good to have you with us, Ms. Tillman. Good morning. May it please the court, I'm Ainsley Tillman and I'm here for Jill Jenks. I'd like to start by addressing the cross appeal and making it clear to this court that South Carolina's Nonprofit Corporation Act does not and is not intended to imbue HOAs with unbridled power. Just like any other corporation, nonprofits in South Carolina are absolutely constrained in that they cannot act in defiance of the law or contract. And the same goes for the members of an HOA. Members of a corporation cannot ratify something that is unlawful and they certainly cannot ratify an unlawful act that their corporate fiduciaries have deliberately obscured from them. But it's unlawful because it's not authorized, right? And a principal can ratify the unauthorized acts of its agent, right? I've got so many answers. It's more than just unauthorized. It is not allowed. It is prohibited. And here, as counsel for CSA just explained, CSA was not purporting to act as the agent of the participating property owners at the time that it called this referendum. They've just explained to this court that CSA was acting in its own stead. It was acting on its own behalf. And the covenants are clear that CSA does not have the power or the authority under those 1974 covenants to call for a referendum to amend them. And that's important because CSA is as much bound by those 1974 covenants that they were seeking to amend as are all the participating property owners. And those covenants only permit two methods of amendments. As Your Honor, Judge Wynn has pointed out, those two methods of amendments are either the company calls the referendum or the 10% of the participating property owners do. And neither of those things occurred here. But the independent opportunity to do it, the South Carolina Nonprofit Act is alleged to confer upon them. So the South Carolina Nonprofit Corporation Act is absolutely not a Hail Mary pass to do anything that a corporation wants to do. In fact, the language of the act is clear. This is 33-31-302, that unless its articles of incorporation provide otherwise, and that's actually what the district court correctly found, that here the covenants did provide otherwise. But also that a corporation has the power to do all things necessary or convenient that are not inconsistent with the law. And here's the problem, or an example, Your Honor, is that CSA could not, as a nonprofit corporation, decide to sell your house. Because it found that it was necessary and convenient to sell your house. The Nonprofit Corporation Act would not give it the power to do that. And similarly, ratification, no amount of membership voting or shareholder voting could make CSA's decision to sell your house, could transform that into a lawful conveyance. And that's the problem, because the law of agency in South Carolina is that a principal cannot ratify an unlawful act. And the law of real property in South Carolina is that covenants and restrictions that run with the land must be strictly construed. And unless covenants are amended in strict conformance with the amendment procedure, where they have one, then the resulting amendment is invalid. And that's what happened here. The covenants have that two-fold process for amendment. An intervener, CSA, came in, a third party, not a party to the amendment process, and on its own behalf, on its own steam, it called this referendum. And the moment that it did that, it tainted the process. And South Carolina law is clear that, again, the process matters. The process matters, and unless it is followed, then covenants can't be amended. The resulting amendment is invalid. And we cited those cases in our brief. That's Kynard v. Richardson and Brown v. Bass. And as to ASPO, its sole reason for existence is to be a sort of self-appointed watchdog for covenant compliance. And here, where the amendment process was unambiguous, and CSA has never before called a referendum, then ASPO should have been on alert. For it to endorse and approve of a plainly illegitimate referendum, and then actively encourage its members to vote on it, certainly gave rise to a cause of action by Jill Jenks for breach of contract. And as to her damages, the circuit court found on summary judgment that she had not shown damages. But the law in South Carolina is that where there's a breach, there's at least nominal damages that are presumed. But it was more than that. Ms. Jenks joined an organization that's supposed to be a covenant watchdog in the community. She paid dues to that organization for that purpose. And so she at least didn't get the benefit of the bargain of her dues. And then in addition to that, the remedy that she sought was an injunction. She was seeking injunctive relief, more than just monetary damages. And so on summary judgment, and that's important because I heard references this morning to the trial judge. There was not a trial here. This was a summary judgment decision by the circuit court in the teeth of factual evidence, factual evidence on ratification that the members of the corporation hadn't been told all that they would have needed to know if they were going to ratify this act by the corporation, which again. Do you want to respond just briefly to that? I think your friends on the other side said the ultra virus argument only came up in the reply. They claim it wasn't preserved. Did you want to respond to that briefly? So I think from the outset, I want to know from the outset of this. Bill Jinks's claim has been that that CSA acted on law. And it's more than ultra virus. You know, ultra virus is a confusing doctrine because it can mean it's something that they did without authority. But her claim from the outset of this case is not just that it isn't that it isn't authorized. It's that it's unlawful. It's in breach of an entirely separate contract. This is not a corporate document that CSA was seeking to change. This is our real covenants that run with the land. So there's no dovetail between the two of them. It's two separate documents. And so from the outset of the case, Ms. Jinks has argued that that action by CSA was unlawful. And therefore, ratification wasn't a legitimate defense. And so we're asking this court. The district court had a tough time. It had a tough job. It waded through hundreds of pages of governing documents here. And it found correctly that nowhere in those hundreds of pages is there a provision that permits CSA to call for a referendum. And it found correctly that South Carolina's Nonprofit Corporation Act is not a free pass for a corporation to do whatever it feels like it should do. The court erred on ratification, though. And CSA is asking this court to find that an HOA is untethered from the law and that if it can only get enough votes, it can erase an unlawful process. And that cannot be the law in South Carolina. And so we're asking this court to reverse the district court in its erroneous ruling on ratification and remand for further proceedings. And vacate the remainder of its decision, which was contingent on the validity of the reference. Thank you, Ms. Tillman. We appreciate it. Mr. Weidner? A couple of things. We have never said, and I don't think anyone's ever suggested before, that the CSA was somehow acting on their own behalf. Everything we do, we do on behalf of and for the benefit of the property owner. That's our reason to exist. They, in fact, in their reply, excuse me, in their response to our cross-appeal, they keep setting up strawman arguments, and they've done it again today. They say that we take the position that the Nonprofit Act gives us plenary power to do anything we want to do. That is not and never has been our argument. They say that it gives us the power to amend the covenants. We have never said that. We have never said that. And our argument has always been this. If the 1974 covenants do not prohibit us from calling the referendum, then the Act gives us the power to do it. There's no claim that the power overrides the covenant. If the covenant does prohibit us from doing it, then the Act does not give us the power because it cannot contravene the covenant. And we have never argued it that way, but they keep saying that's what our argument is, and it is not. The judge here, who I agree is not a trial judge, he will be the trial judge if there's a remand because it's going to be a bench trial. It's not going to be a jury trial. But it has always been our argument, and they keep ignoring it because they don't have a good response for it. They never responded to our actual argument. And I think this court has the right to find it as a forfeiture because of that, and we laid that out in a brief. But what they do is they say these are their arguments, and they're not our arguments. If they're going to reply to our arguments, respond to our arguments, they need to respond to the arguments that we made, not the arguments they want us to have made. My time is out, Your Honor. Thank you very much. We'll come down and re-counsel, and then, Madam Clerk, we'll adjourn court for tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, James Andrew Wynn, Allison J. Rushing